[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-13295
_____

D.C. Docket No. 1:14-cv-03283-RWS


GRANGE MUTUAL CASUALTY COMPANY,

Plaintiff-Appellant,

versus

BORIS WOODARD,
SUSAN WOODARD,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____
(June 23, 2016)

Before HULL and BLACK, Circuit Judges, and MORENO,[*] District Judge.

HULL, Circuit Judge:

_____

[*]Honorable Federico A. Moreno, United States District Judge for the Southern District of Florida, sitting by designation.

This case arises from an automobile accident involving the Dempseys and the Woodards, in which Thomas Dempsey was at fault. Dempsey was insured by Grange Mutual Casualty Company (the "Insurer Grange"). The Woodards offered the Insurer Grange a settlement within the Dempseys' policy limits of $100,000. The Insurer Grange argues that it properly accepted the settlement offer, forming a binding contract. The Woodards, however, argue that the Insurer Grange failed to comply fully with the terms of the offer and that the Insurer Grange, therefore, never accepted the offer. This case implicates O.C.G.A. § 9-11-67.1, a new Georgia statute governing settlement offers for personal injury and death claims arising from motor vehicle accidents. No court has yet interpreted § 9-11-67.1. After review, and with benefit of oral argument, we find that it is necessary to certify questions of Georgia law to the Georgia Supreme Court concerning the interpretation of § 9-11-67.1.

## I. BACKGROUND

### A. Factual Background

These facts are not disputed. On March 20, 2014, Thomas Dempsey, an Ohio resident, was driving his car in Georgia with his wife, Delann Dempsey, as a passenger. Dempsey collided with a car operated by Boris Woodard in which his adult daughter, Anna Woodard, was a passenger. Both Boris and Anna Woodard

2

sustained injuries during the accident.  Anna's were fatal, and she subsequently died.

The Dempseys carried car insurance through the Insurer Grange.  The Dempseys' liability limits for bodily injury claims were $50,000 per person and $100,000 per accident.

The Insurer Grange learned of the accident on March 21, 2014, and assigned Senior Claims Representative Heather Conn ("Adjuster Conn") to handle the Woodards' prospective bodily injury claims against the Dempseys.  Adjuster Conn attempted to contact Boris Woodard.  On April 4, 2014, Conn received a letter of representation from Woodard's attorney, T. Shane Peagler ("Attorney Peagler") of the Law Offices of Michael Lawson Neff, P.C.  Attorney Peagler and Adjuster Conn communicated several times about the Woodards' claims.

On June 19, 2014, Attorney Peagler mailed Adjuster Conn a "time-limited demand," i.e., a settlement offer, for Boris Woodard's personal injury claim and for Boris and Susan Woodards' wrongful death claim for their daughter Anna.  The title of the June 19 letter was "Offer to Settle Tort Claims Made Pursuant to O.C.G.A. § 9-11-67.1 and O.C.G.A. § 51-12-14."  The Woodards offered a limited release of their claims against the Dempseys and the Insurer Grange in exchange for the $100,000 policy limit.

The Woodards' June 19 letter contained an 11-item list of requirements for the Insurer Grange to comply with to accept the settlement offer. A statement, typed in bold, preceded the list and said: "The following items must be noted and fully and strictly complied with in order to accept this offer." The items most relevant to this appeal (numbers 1-5) are summarized below.

(1)    "Pursuant to O.C.G.A. § 9-11-67.1, you have 30 days from your receipt of this offer to accept it."

(2)    "Your acceptance of this offer must be made in writing to me at the above address shown in my letterhead. If we do not actually receive a timely acceptance, this offer will be deemed rejected . . . ."

(3)    Acceptance requires affidavits from Thomas Dempsey, Delann Dempsey, and a Grange officer, swearing to the policy limits. "All three affidavits must be received in my office within ten (10) days after your written acceptance of this offer to settle. Timely compliance with this paragraph is an essential element of acceptance."

(4)    "If payment is not tendered in cash pursuant to OCGA 9-11-67.1(f)(1), payment in the amount of $50,000 must be made payable to 'Boris and Susan Woodard and Michael L. Neff, their attorney for the wrongful death of their daughter, Anna Woodard' within ten (10) days after your written acceptance of this offer to settle. Timely payment is an essential element of acceptance."

(5)    "If payment is not tendered in cash pursuant to OCGA 9-11-67.1(f)(1), payment in the amount of $50,000 must be made payable to 'Boris Woodard and Michael L. Neff, his attorney' within ten (10) days after your written acceptance of this offer to settle. Timely payment is an essential element of acceptance."

4

Adjuster Conn received the June 19 offer via certified mail on June 23.  Attorney Peagler agreed to give the Insurer Grange until July 23 (which was 30 days) to accept the offer.  If the offer was accepted in writing, then Attorney Peagler's letter provided that payment in the amount of $50,000 per claim must be made "within ten (10) days after your written acceptance of this offer to settle."

On July 22, Adjuster Conn mailed Attorney Peagler a letter accepting the settlement offer.  Adjuster Conn's letter (dated July 22) stated that, per Peagler's instructions, the affidavits and checks would "follow under separate cover within the time constraints outlined (10 days from acceptance of your demand)."  Ten days from the July 22 acceptance letter was August 1.  On July 29, within the 10-day window set to expire on August 1, Adjuster Conn emailed Attorney Peagler the affidavits.  In her July 29 email, Conn stated that the checks were being issued that day.

Adjuster Conn ordered the two settlement checks through the Insurer Grange's automated claims payment system.  According to Conn, this is the Insurer Grange's routine practice for ordering checks to pay claims.  Adjusters pull the mailing address for the checks from contact information previously uploaded into the Insurer Grange's system.  The adjusters order the checks to go to the address on file, and then the checks are printed and mailed from a central location.  The adjusters never see the checks.  Adjuster Conn followed this process for

mailing the settlement checks on July 29, using the contact information that was in the system for "Michael L Neff PC." Again, Attorney Peagler worked for the Law Offices of Michael Lawson Neff, P.C.

On August 11, attorney Michael Neff ("Attorney Neff") contacted Adjuster Conn on behalf of the Woodards, and the two talked on August 12. Attorney Neff told Conn that the settlement checks had not arrived and that, therefore, the parties never reached a binding settlement agreement because the Insurer Grange had failed to accept the Woodards' offer in a timely fashion. Adjuster Conn was surprised because she had mailed the checks on July 29 and had received nothing indicating that they had been returned. Furthermore, Adjuster Conn believed that the parties had a binding settlement agreement based on the Insurer Grange's July 22 written acceptance of the Woodards' offer.[1] Adjuster Conn offered to reissue new checks for overnight delivery, but Attorney Neff was unwilling to accept them.

Conn stopped payment on the original checks and issued new checks. The Insurer Grange's records show that the stated reason for stopping payment on the checks was "wrong address." On August 12, Adjuster Conn mailed the new checks to Attorney Neff, along with copies of screenshots confirming the July 29

---

[1]Adjuster Conn's affidavit is unclear about whether she conveyed these sentiments to Attorney Neff.

timely issuance of the original checks.  According to Conn's accompanying letter to Neff, the screenshots showed that the law office's address was complete in the "address tab," but "somehow drop[ped] off in the mail/billing address tab."  Conn apologized for the fact that there had been an "error while processing the checks."

On August 14, Attorney Neff emailed Adjuster Conn to say that the Woodards would not accept the reissued checks.  That same day, Attorney Neff sent a letter returning the reissued checks and stating that the Woodards rejected the Insurer Grange's untimely response to the settlement offer and that they would be filing a lawsuit in the near future.

In an affidavit filed in this case, Adjuster Conn stated that she later examined the Insurer Grange's records and confirmed that the company had the correct address for Attorney Neff's law firm.  Adjuster Conn hypothesized that the checks never arrived because a portion of the address was "dropped from the actual checks that were printed," though she could not be certain of this because she never saw the checks.  Adjuster Conn stated that the original checks still had not been returned to Insurer Grange.

During his deposition, Thomas Dempsey stated that "[s]omebody that works for Grange" told him that the wrong address was put on the envelopes.  Dempsey thought that the person he spoke to was Heather Conn.  Dempsey said that Conn

told him about the address issue sometime after the agreed-upon time to accept the offer had expired.

Keith Johnson, the Insurer Grange's Assistant Vice President of Application Development (information technology), executed an affidavit as well. Johnson stated that he researched the issuance and mailing of the checks. He confirmed that they were issued on July 29 and mailed on July 30. However, when Johnson created "test checks" using the information in the Insurer Grange's system, the street was missing from the mailing address printed on the checks. The record suggests that the Insurer Grange used envelopes with clear plastic windows to mail checks so that the mailing address printed on the checks would show through. Johnson concluded: "It seems, therefore, the street address was likely missing from the July 2014 checks."

## B.    Procedural History

On October 10, 2014, the Insurer Grange filed a one-count complaint against Boris and Susan Woodard. The Insurer Grange alleged breach of the settlement contract and, as relief, requested specific performance of the contract and attorney's fees.

In its complaint, the Insurer Grange alleged that a binding and enforceable settlement agreement was formed on July 23, when it sent Attorney Peagler its written acceptance letter. No one disputes that Attorney Peagler received the

8

letter.  Furthermore, the Insurer Grange argued that it performed its duties with respect to payment when it issued and mailed the checks within 10 days, on July 29.

The Woodards filed a motion to dismiss, arguing that the existence of a settlement agreement was an affirmative defense that should be addressed within the tort suit arising from the car crash.  The Woodards eventually withdrew this motion and filed an answer, in which they denied that the parties ever formed a settlement contract.  Alternatively, they claimed that, if there were such a contract, it was either (a) rendered null and void by failure of consideration or (b) rescinded because the Insurer Grange failed to timely perform.

The Woodards also filed a motion for summary judgment claiming that no settlement contract was formed.  They argued that timely payment was a condition of acceptance of their June 19 offer, and that, because the Insurer Grange did not actually send them payment within the stated time limits, Grange never accepted their settlement offer.  Thus, as a matter of law, they argued, the Insurer Grange rejected the settlement offer when the 10-day time limit to accept the offer (and make timely payment) expired (after August 1, 2014).  The Woodards stressed that their offer complied with state law.

The Insurer Grange cross-moved for summary judgment and responded to the Woodards' motion, principally arguing that the parties had formed a binding

settlement contract. The Insurer Grange argued that the Woodards' offer letter clearly demanded a written acceptance within 30 days (by July 23, 2014) and not acceptance in the form of payment. Additionally, the Insurer Grange claimed that O.C.G.A. § 9-11-67.1, a recently-enacted statute that the Woodards cited multiple times in their offer letter, made written correspondence the sole means of accepting the Woodards' offer. The Insurer Grange suggested that the statute did not contemplate or authorize unilateral contracts that required full performance (here, payment) as the required means of accepting the offer. In any event, the Insurer Grange added, it complied with the Woodards' demand to make payment "payable" within 10 days of its written acceptance by "making out" the checks before that deadline passed. The Insurer Grange emphasized that the offer letter did not demand that payment actually be "deliver[ed]" by a date certain.

Notably too, the offer letter required that the affidavits "must be received" in Attorney Peagler's office within 10 days after written acceptance, but did not mention delivery or receipt of the checks. In effect, the Insurer Grange contended that issuing or delivering the checks was an issue of contract performance, rather than contract formation.

The Woodards filed a reply brief in support of their motion that also served as a response to the Insurer Grange's cross-motion. They agreed that their offer was to form a unilateral contract, stressing that it unambiguously demanded timely

10

payment as a condition of acceptance, and argued that Georgia law did not prevent them from contracting in that fashion. They also contended that, even if their offer did not comply with § 9-11-67.1, the proper result would be a determination that no contract was formed. On the latter point, the Woodards stressed that the Insurer Grange had cited no legal authority that would allow a court to alter the plain terms of an offer even if the offer's terms were prohibited by § 9-11-67.1, and that § 9-11-67.1 "does not provide a remedy for noncompliance."

On the issue of whether the Insurer Grange accepted the Woodards' offer, the Woodards argued that Grange did not make timely payment (as required to accept their offer) because it did not actually mail checks that were properly addressed to the Woodards' counsel. According to the Woodards, the problem was not merely that the checks were not received by Attorneys Peagler or Neff. Rather, even if the Insurer Grange did prepare the checks within the 10-day window and put them in the mail, it could not reap the benefits of Georgia's mailbox rule (and have this count as "acceptance" of the offer) because the evidence showed that Grange did not properly print the mailing address on the checks. The Woodards emphasized that filling out checks is not the same as making payment.

The Insurer Grange filed a reply contending that the parties formed a binding settlement contract pursuant to § 9-11-67.1 when it assented, in writing, to the five material terms in the Woodards' offer. The Insurer Grange also stressed

11

that, under Georgia law, any ambiguities in the written offer as to its terms had to be construed against the Woodards (as their attorney drafted the letter).

On June 25, 2015, the district court granted the Woodards' motion for summary judgment and denied the Insurer Grange's cross-motion, concluding that the parties never formed a contract. The district court first concluded that O.C.G.A. § 9-11-67.1 does not prohibit a party from requiring payment as a condition of acceptance of a settlement offer. Then, looking at the Woodards' offer, the district court determined that the Woodards, in fact, made timely payment a condition of acceptance of their offer.

The district court then turned to whether the Insurer Grange complied with the payment requirement. The district court stated that any ambiguity in the offer's provision that "payment in the amount of $50,000 must be made payable . . . within ten (10) days after your written acceptance" was cured by the following sentence in the offer letter, which stated that "[t]imely payment is an essential element of acceptance." The district court found that "payment" required more than writing checks. Also noting that the Woodards' letter did not define the term "payment," the district court ruled that payment required the Insurer Grange's delivery – and the Woodards' receipt – of the checks, citing "60 AM. JUR. 2d *Payment* § 1 and Black's Law Dictionary 1243 (9th ed. 2009)." The district court noted that the Woodards notified the Insurer Grange that timely payment had not

12

been received and that the Insurer Grange acknowledged that there had been a mailing address error on the checks. The district court concluded that the Insurer Grange failed to pay on time, that it consequently failed to accept the Woodards' settlement offer, and that the parties thus had not formed a binding settlement agreement.

The Insurer Grange appealed from this order.

## II. STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo. All. Metals, Inc. v. Hinely Indus., 222 F.3d 895, 897 (11th Cir. 2000). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Federal courts sitting in diversity apply the substantive law of the forum state. See Tech. Coating Applicators, Inc. v. U.S. Fid. & Guar. Co., 157 F.3d 843, 844 (11th Cir. 1998). Here, we apply Georgia's contract law. See S. Med. Corp. v. Liberty Mut. Ins. Co., 454 S.E.2d 180, 182 (Ga. 1995) (stating that settlement agreements made in Georgia or under Georgia law are formed and enforced in the same way as any other contract).

## III. DISCUSSION

The issue on appeal is whether the Insurer Grange accepted the Woodards' settlement offer, thereby forming an enforceable contract. This issue requires

13

analysis of several sub-issues, including but not limited to: (a) whether the Insurer Grange's written letter of acceptance was sufficient to accept the Woodards' offer and form a binding settlement contract; (b) whether, instead, payment (by delivery or mailing) was also required as a condition of acceptance; (c) whether such a requirement would be permissible under Georgia law (a question that implicates O.C.G.A. § 9-11-67.1); and (d) whether the Woodards' offer was ambiguous and, if so, what effect that has on the above issues. We set forth the parties' arguments on appeal before analyzing the relevant Georgia statute. We then state the certified questions.

## A.    The Insurer Grange's Arguments

The Insurer Grange makes two arguments: one is based on statutory interpretation, and the other interprets the terms of the Woodards' settlement offer. First, the Insurer Grange claims that its written acceptance of the Woodards' offer sufficed to form a contract under O.C.G.A. § 9-11-67.1. The Insurer Grange also contends that this statute prohibits unilateral contracts. Second, the Insurer Grange claims that it properly accepted the Woodards' offer, even setting-aside the statute, because (a) the Woodards' offer only required a written acceptance from the Insurer Grange within 30 days to form a contract, and (b) even if timely payment was a condition of acceptance, the offer only required that the Insurer Grange timely issue settlement checks, not actual receipt by the Woodards.

14

In unpacking its first (statutory) argument, the Insurer Grange analyzes subsections (a) and (b) of § 9-11-67.1.  The Insurer Grange notes that, under subsection (a), any offer to settle a tort claim for personal injury or death arising from a motor vehicle accident must be in writing and contain five "statutorily-defined material terms."  These five terms are: (1) the time period within which such offer must be accepted, which shall be not less than 30 days from receipt of the offer; (2) the amount of monetary payment; (3) the party or parties the claimant or claimants will release if such offer is accepted; (4) the type of release, if any, the claimant or claimants will provide to each releasee; and (5) the claims to be released.  O.C.G.A. § 9-11-67.1(a).  The Insurer Grange notes that, under subsection (b), "the recipients of an offer to settle made under this Code section may accept the same by providing written acceptance of the material terms outlined in subsection (a) of this Code section in their entirety."  Id. § 9-11-67.1(b) (emphasis added).  Thus, when the offeree accepts the subsection (a) material terms of an offer in writing, there is a contract between the parties under § 9-11-67.1.  It follows, the Insurer Grange concludes, that the statute prohibits unilateral contracts that require acceptance in the form of performance – here, payment.

In this case, the Insurer Grange notes that the Woodards' offer letter cited § 9-11-67.1 and included the five subsection (a) material terms, evidencing an intent to enter into a binding contract pursuant to the statute.  The Insurer Grange

15

asserts that because it then fully complied with § 9-11-67.1 by providing the Woodards with a timely written acceptance letter assenting to these five material terms, a contract was formed. All of the offer's other terms thus concerned the Insurer Grange's performance obligations under the parties' contract and were not conditions of acceptance of the offer.

As to its second (contract-interpretation) argument, the Insurer Grange contends that, even setting-aside the § 9-11-67.1 statute, it properly accepted the Woodards' offer because the offer required only written acceptance, not performance, to bind the parties. The Insurer Grange points to items 1 and 2 of the Woodards' offer, which gave Grange 30 days to "accept" the offer in writing. The Insurer Grange argues that the remaining nine items detailed in the offer (including payment), which were scheduled to happen after the 30-day "acceptance" deadline, were necessarily conditions of performance. The Insurer Grange emphasizes that the offer created ambiguity by first stating that written acceptance was required and then stating that "timely payment" (a form of subsequent performance) was "an essential element of acceptance." The Insurer Grange stresses that, under Georgia law, this ambiguity must be resolved against the Woodards because their attorney drafted the offer letter, and contends that the district court erred in doing the opposite.

Moreover, the Insurer Grange claims, to the extent that the offer demanded timely payment as a condition of acceptance, Grange met this requirement because it only had to make the settlement checks "payable" within 10 days (i.e., make them out or "issue" them) – not deliver them. The Insurer Grange highlights that the Woodards' offer letter explicitly required delivery of affidavits by a date certain, but used different language when discussing payment. The Insurer Grange claims that the Woodards could have used the same delivery or "must be received" language when discussing payment, but did not do so. Thus, the Woodards' offer did not require delivery or receipt of the checks within 10 days, and the Insurer Grange accepted the offer (at the latest) when it "ma[de] out" the checks. The Insurer Grange challenges that it is at least ambiguous whether delivery of payment was required, and again stresses that the offer's ambiguities must be resolved against the Woodards (as the drafters).

## B.    The Woodards' Arguments

The Woodards first argue that their offer letter clearly and unambiguously required timely payment as a condition of acceptance, stressing that it twice stated, in prominent locations, that "[t]imely payment is an essential element of acceptance." They contend that courts cannot read a contract in a way that renders a provision meaningless, and that this Court therefore cannot ignore this demand in their offer letter. The Woodards contend that they made both (a) written

17

acceptance of the offer within 30 days and (b) payment 10 days thereafter conditions of acceptance of their offer.  Because no payment was made within the later 10-day window, no settlement contract was formed ab initio.

On the issue of whether the Insurer Grange satisfied the "timely payment" requirement, the Woodards contend that Grange failed this requirement by not properly addressing and mailing the checks to them.  The Woodards argue that merely issuing and "filling out" checks does not constitute "payment," and that payment requires cutting and mailing checks with proper addresses.  Because the record indisputably shows that the checks were not properly addressed for mailing, their argument continues, the Insurer Grange did not make timely payment within 10 days of responding to the offer in writing, and thus did not accept the Woodards' offer.  Therefore, the Woodards conclude, a binding contract was never formed.[2, 3]

As to § 9-11-67.1, the Woodards claim that their offer complied fully with the statute.  They contend that nothing in § 9-11-67.1 suggests that it outlawed unilateral contracts or that a claimant could not require material terms beyond the

---

[2]The Woodards also emphasize that the Insurer Grange could not properly accept their offer merely by putting the checks in the mail pursuant to Georgia's mailbox rule, given that Grange's mailings were improperly addressed.

[3]Although the Woodards' briefing indicated that the Insurer Grange's mistake was in not delivering payment to the Woodards within the deadline, the Woodards clarified their position at oral argument that Grange's mistake was in not properly mailing payment.

18

ones listed in subsection (a) as conditions of acceptance. They further note that, under Georgia common law, they were free (as the "masters of their offer") to require both written acceptance and timely payment 10 days later as a condition of acceptance. They stress that a statute may not be read to contradict common law rules (under Georgia law) unless it does so in plain and explicit terms. Thus, the Woodards conclude, this Court should not find that the § 9-11-67.1 statute displaced the common law rule given that the statute did not do so explicitly.

In fact, the Woodards claim, the § 9-11-67.1 statute clearly permitted the parties to enter a unilateral contract. They highlight subsection (c) of the statute, which states that "[n]othing in this Code section is intended to prohibit parties from reaching a settlement agreement in a manner and under terms otherwise agreeable to the parties." O.C.G.A. § 9-11-67.1(c). The Woodards assert that subsection (c) permitted the parties to set their own settlement terms, that the Woodards did so by making timely payment an essential element of acceptance, and that the Insurer Grange agreed to this term (consistent with subsection (c)) in its response letter by not objecting to it. The Woodards also note that subsection (g) of the statute states that "[n]othing in this Code section shall prohibit a party making an offer to settle from requiring payment within a specified period," arguing that this further supports their ability to make timely payment a condition of acceptance. Id. § 9-11-67.1(g).

19

Additionally, the Woodards argue that, even if the statute prohibited the type

of offer they extended, the statute does not authorize "blue pencil[ing]" the offer

and concluding that there was a binding agreement.  Instead, this Court should find

that no meeting of the minds occurred and that no contract was formed.[4]

## C.    The Insurer Grange's Reply

On reply, the Insurer Grange argues that the Woodards have downplayed the

extent to which § 9-11-67.1 was meant to circumscribe common law, and

emphasizes that the statute prescribed acceptance in the form of a written

unequivocal acceptance of five specific material terms.  Looking back at the offer

letter itself, the Insurer Grange also again stresses that its terms are ambiguous.

The Insurer Grange urges that the statement, "[t]imely payment is an essential

element of acceptance," should not control this Court's reading of the offer.  The

Insurer Grange notes that the offer letter also stated that Grange was to "accept" in

writing within 30 days of receipt, and that the offer required the actual delivery of

specific items, such as affidavits, but notably did not specifically require delivery

of payment.  The Insurer Grange interprets a case cited by the Woodards (that

---

[4]The Woodards also attack the notion that "public policy considerations" weigh in favor of the Insurer Grange's appeal.  The Woodards argue, <u>inter alia</u>, that the Insurer Grange's failure to pay was not caused by an unreasonable deadline set by the Woodards but by Grange's decision to procrastinate on payment and use a dysfunctional system to send them the checks.

discusses tendering payment) as supporting Grange's argument that making a check "payable" does not necessarily entail delivering payment.[5]

## D.    Analysis of § 9-11-67.1

"Absent a limiting statute or controlling public policy, parties may contract with one another on whatever terms they wish and the written contract defines the full extent of their rights and duties." Effingham Cty. Bd. of Comm'rs v. Park W. Effingham, L.P., 708 S.E.2d 619, 622 (Ga. Ct. App. 2011) (quotation marks omitted).  In this case, there is a statute that arguably limits the parties' common-law freedom to contract.  In 2013, the Georgia General Assembly enacted O.C.G.A. § 9-11-67.1, which governs "causes of action for personal injury, bodily injury, and death arising from the use of a motor vehicle on or after July 1, 2013." Id. § 9-11-67.1(h).  The relevant parts of the statute read as follows:

(a) Prior to the filing of a civil action, any offer to settle a tort claim for personal injury, bodily injury, or death arising from the use of a motor vehicle and prepared by or with the assistance of an attorney on behalf of a claimant or claimants shall be in writing and contain the following material terms:

(1) The time period within which such offer must be accepted, which shall be not less than 30 days from receipt of the offer;

---

[5]The Georgia Defense Lawyers Association ("GDLA") filed an amicus brief in support of the Insurer Grange's position.  We need not outline amicus arguments for the purposes of this opinion but assume this amicus, and probably others, will make their arguments to the Georgia Supreme Court that they deem fit.  The GDLA concludes, *inter alia*, that the parties entered an enforceable settlement agreement when the Insurer Grange accepted the Woodards' offer in writing.

      (2) Amount of monetary payment;

      (3) The party or parties the claimant or claimants will release if such offer is accepted;

      (4) The type of release, if any, the claimant or claimants will provide to each releasee; and

      (5) The claims to be released.

(b) The recipients of an offer to settle made under this Code section may accept the same by providing written acceptance of the material terms outlined in subsection (a) of this Code section in their entirety.

(c) Nothing in this Code section is intended to prohibit parties from reaching a settlement agreement in a manner and under terms otherwise agreeable to the parties.

(d) Upon receipt of an offer to settle set forth in subsection (a) of this Code section, the recipients shall have the right to seek clarification regarding terms, liens, subrogation claims, standing to release claims, medical bills, medical records, and other relevant facts.  An attempt to seek reasonable clarification shall not be deemed a counteroffer.

(e) An offer to settle made pursuant to this Code section shall be sent by certified mail or statutory overnight delivery, return receipt requested, and shall specifically reference this Code section.

. . .

(g) Nothing in this Code section shall prohibit a party making an offer to settle from requiring payment within a specified period; provided, however, that such period shall be not less than ten days after the written acceptance of the offer to settle.

Id. § 9-11-67.1.  There are no published state or federal cases interpreting this statute.

22

It has been posited that the General Assembly's goal in passing § 9-11-67.1 was to address the negative effects of Southern General Insurance Co. v. Holt, 416 S.E.2d 274 (Ga. 1992). See Alex Galvan & Ashley Worrell, Civil Practice: Civil Practice Act, 30 Ga. St. U.L. Rev. 39, 41 (2013). In Holt, the Georgia Supreme Court held that an insured had a bad-faith claim against her insurance company when the company failed to "settle a claim within the policy limits based on a time-limited settlement offer by the injured person's attorney." Holt, 416 S.E.2d at 275. The injured party's attorney originally gave the insurance company 10 days to accept a settlement offer, but then extended the deadline another 5 days, for a total of 15 days. Id. In Holt, the Georgia Supreme Court made clear that it was not condoning tactics by which plaintiff's attorneys give unreasonably short deadlines for accepting an offer, but held that when an insurance company had "knowledge of clear liability and special damages exceeding the policy limits," it had a duty to respond to a deadline to settle and to ultimately settle the claim. Id. at 276 (emphasis omitted).

A perceived concern about Holt, whether right or wrong, was that it was arguably enabling plaintiffs to present settlement offers "with impossible deadlines and expose [the] insurance company to potential 'bad faith' claims when it is unable or unwilling to abide." Galvan & Worrell, supra, at 40. In enacting § 9-11-67.1, the General Assembly reportedly sought to reduce bad-faith claims by giving

23

insurance companies adequate time to investigate claims and offers before having to decide whether to settle.  Id. at 42, 44.  The Act was arguably meant to be a compromise between the plaintiff and defense bars and to reduce "procedural quibbling over the technical sufficiency of a settlement offer."  Id. at 44-45.

Section 9-11-67.1, while meant to create a clear procedure, is arguably ambiguous with respect to its requirements.  On one hand, the statute appears to contemplate that an offeree will accept the offer in writing.  The statute lists material terms that must be included in the offer and then states that "the recipients of an offer to settle . . . may accept the same by providing written acceptance of the material terms."  O.C.G.A. § 9-11-67.1(a)-(b).  It also states that the offeror can require payment within a limited timeframe, provided the time "period shall be not less than ten days after the written acceptance of the offer to settle."  Id. § 9-11-67.1(g) (emphasis added).  Taking these provisions together, the statute appears to contemplate that the written acceptance of the offer comes first and forms a binding settlement contract.  On this view, the statute contemplates payment being a term of contract performance, not contract formation.

On the other hand, the statute goes on to say that it is not meant "to prohibit parties from reaching a settlement agreement in a manner and under terms otherwise agreeable to the parties."  Id. § 9-11-67.1(c).  This provision arguably permits the parties to contract in any manner they see fit, although this would allow

24

them to override the statute's other provisions by contracting around the procedure outlined above. Under Georgia law, we should avoid "interpreting statutes in a manner that renders any portion of them surplusage or meaningless." Hill v. Owens, 738 S.E.2d 56, 60 (Ga. 2013).

## IV.    CERTIFICATION

This Court has said that certification may be appropriate when there are insufficient sources of state law to allow a principled rather than conjectural conclusion. See Royal Capital Dev., LLC v. Md. Cas. Co., 659 F.3d 1050, 1055 (11th Cir. 2011)  When there is substantial doubt about the correct answer to a dispositive question of state law, a better option than purely guessing may be to certify the question to the state supreme court. See In re Cassell, 688 F.3d 1291, 1300 (11th Cir. 2012), certified question answered sub nom. Silliman v. Cassell, 738 S.E.2d 606 (Ga. 2013).

While this Court can always examine Georgia's canons of statutory construction to attempt to determine how Georgia courts would interpret a statute, there is no Georgia precedent interpreting or applying the specific statute at issue here. Furthermore, § 9-11-67.1 controls Georgia settlement agreements arising from automobile accidents, and thus any interpretation of § 9-11-67.1 will have far-reaching consequences. Certification in this case allows the Georgia Supreme Court to interpret this new Georgia law in the first instance.

25

Because the relevant facts are undisputed and this appeal depends on interpretations of Georgia law, we certify the following questions to the Georgia Supreme Court:

(1)    UNDER GEORGIA LAW AND THE FACTS OF THIS CASE, DID THE PARTIES ENTER A BINDING SETTLEMENT AGREEMENT WHEN THE INSURER GRANGE ACCEPTED THE WOODARDS' OFFER IN WRITING?

(2)    UNDER GEORGIA LAW, DOES O.C.G.A. § 9-11-67.1 PERMIT UNILATERAL CONTRACTS WHEREBY OFFERORS MAY DEMAND ACCEPTANCE IN THE FORM OF PERFORMANCE BEFORE THERE IS A BINDING, ENFORCEABLE SETTLEMENT CONTRACT?

(3)    UNDER GEORGIA LAW AND THE FACTS OF THIS CASE, DID O.C.G.A. § 9-11-67.1 PERMIT THE WOODARDS TO DEMAND TIMELY PAYMENT AS A CONDITION OF ACCEPTING THEIR OFFER?

(4)    UNDER GEORGIA LAW AND THE FACTS OF THIS CASE, IF THERE WAS A BINDING SETTLEMENT AGREEMENT, DID THE INSURER GRANGE BREACH

26

THAT AGREEMENT AS TO PAYMENT, AND WHAT IS

THE REMEDY UNDER GEORGIA LAW?

The phrasing of these certified questions is not intended to restrict the

Supreme Court's consideration of the issues or the manner in which the answers

are given.  To assist the Supreme Court's consideration of this case, the entire

record and the parties' briefs shall be transmitted to the Georgia Supreme Court.

**QUESTIONS CERTIFIED.**